# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 8, 2007 Session

## ARTHUR BUFORD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 01-04246     James C. Beasley, Jr., Judge**

---

**No. W2006-00346-CCA-R3-PC  -  Filed November 30, 2007**

---

The petitioner, Arthur Buford, appeals from the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions for two counts of first degree murder. See T.C.A. § 39-13-202. He was sentenced to two life sentences to be served consecutively. The petitioner contends the trial court erred in denying him post-conviction relief based upon the ineffective assistance of counsel. We conclude that no error exists and affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Arthur Buford.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scot A. Bearup, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

According to this court's opinion on direct appeal, the petitioner shot and killed the victims, Cedric Moerings and Tyler Jones, in the victims' apartment. While the petitioner was inside the apartment, Omarr Hurd, Justin McNeil, and the petitioner's sister were outside in a car. The petitioner and Hurd were arrested together three days after the crimes occurred. The petitioner gave several different versions of events to the police, and he admitted the shootings only after he was confronted with the statements of other witnesses. Hurd and McNeil testified against the petitioner at trial. State v. Arthur Buford, III, No. W2002-02258-CCA-R3-CD, Shelby County (Tenn. Crim. App. Mar. 1, 2004), app. denied (Tenn. June 21, 2004). The petitioner was subsequently prosecuted for perjury relative to his trial testimony. It was apparent in that proceeding that the petitioner's relationship with his trial attorney from the murder trial was contentious. See State v. Arthur Buford,

No. W2004-00786-CCA-R3-CD, Shelby County (Tenn. Crim. App. Aug. 18, 2005), rev'd, 216 S.W.3d 323 (Tenn. 2007) (reversing court of criminal appeals and reinstating trial court's judgment).

The petitioner seeks post-conviction relief based upon alleged shortcomings of trial counsel in the murder case in (1) failing to argue at the suppression hearing that the police unnecessarily delayed a judicial finding of probable cause for his arrest and (2) failing to emphasize John McClee's inconsistent statements to the police. He also claims his appellate counsel was ineffective for failing to raise an appellate issue regarding probable cause for his arrest.

At the post-conviction hearing, trial counsel identified the motion to suppress he filed on behalf of the petitioner, the transcript of the hearing, the court's order, and the motion for judgment of acquittal or new trial. He said the basis of the motion was the lack of probable cause to arrest the defendant.

Trial counsel testified that John McClee told the police that he and "Trey," who was later identified as the petitioner, were present when Omarr Hurd shot the victims. He said that at the suppression hearing, he argued that no evidence showed the petitioner had done anything more than having been present at the shooting, just as McClee had been present, and it was unreasonable to detain him based upon that information alone. He acknowledged that evidence was presented showing that the petitioner's car was found at the scene of the apartment complex and that the petitioner fled with Hurd. He said that McClee gave inconsistent statements to the police and that he attempted to demonstrate that the police did not have reliable information when they arrested the defendant. He acknowledged that he could have gone further in pointing out the inconsistencies in McClee's statements, but he said he did not think it would have made a difference because the officers testified that McClee's statements had been inconsistent.

Trial counsel acknowledged that he did not raise an issue regarding an unreasonable delay in obtaining a probable cause determination. He said he was familiar with State v. Huddleston, a Tennessee Supreme Court case regarding unreasonable delay, at the time of the suppression motion. He said he did not believe this would have been a viable issue.

Trial counsel said the defendant told him the police were not nice to him. However, counsel said he did not believe he was ever given information that the police conduct was illegal. He said that he advised the petitioner that he had a right to testify at the suppression hearing but that the petitioner's testimony would have little relevance to the issues raised. He said the petitioner did not testify at the suppression hearing. He said, however, that the petitioner testified at the trial that he had acted in self-defense and that at the sentencing hearing, the petitioner contradicted his earlier testimony by stating he "didn't do it." He said that at the sentencing hearing, the petitioner said that counsel had "forced or coerced him or tricked him or whatever . . . to admit in front of the jury that he had done it."

Trial counsel testified that the defendant had given him three different versions of events: (1) that he shot the victims in self-defense, (2) that he was present but was not the shooter, and (3)

that he was not there. Counsel said that defense attorneys are often in a difficult situation because their clients tell them different stories and that it is challenging to determine the proper defense to use in order to represent the client as well as to avoid suborning perjury. He said he advised the petitioner that the self-defense theory was the best course in light of the petitioner's pretrial statement admitting to having killed the victims in self-defense, as well as a statement the petitioner's sister had given that the petitioner went to the victims' apartment with a gun, returned without the gun, and said something like, "they'll never see the sunrise again." He said he advised the petitioner that if his pretrial statement about self-defense were true, the petitioner had a right to explain that on the stand. However, he said he told the petitioner that if it were not true, they would not put on evidence to the contrary. He characterized the self-defense theory as a "long shot" but said the alternative would entail the state calling the petitioner's sister to testify against him, which was not a good situation.

Trial counsel testified that he met with the petitioner more than many of his other clients. He said he usually met with homicide defendants more than other clients. Also, he said the petitioner was "new to the system" and "hadn't been in trouble before." Trial counsel described his relationship with the petitioner as "[u]p and down" and said there were "moments of tension." He said he met with the petitioner's mother about twenty times. He said the petitioner's mother was not helpful because she refused to believe that the petitioner had been involved in the crimes and would not acknowledge the state's evidence against the petitioner. He said the petitioner's mother wrote letters of complaint to Jesse Jackson, Johnnie Cochran, "Mr. [Mfume] or whoever the head of the NAACP was at that time," and the President.

Trial counsel testified that the petitioner was indicted for second degree murder and was given a plea offer of forty years. He said the petitioner declined the offer and was re-indicted for first degree murder, which the defense was aware would be a consequence of declining the plea agreement.

Trial counsel testified that the court relieved him from further representation of the petitioner at the sentencing hearing. He said the court appointed another attorney to handle the appellate proceedings.

The petitioner testified that he was arrested at about 9:30 a.m. on January 11, 2000. He said he had been sleeping and that he was "really hung over" after having "drunk like almost . . . a half-gallon of liquor." He said he was taken to the police station and handcuffed to a chair for about two hours. After this time passed, Officers Ryall and Fitzpatrick interrogated him. He said the officers "started hollering a lot of accusations" and physically assaulted him. He said he was choked and hit in the chest and stomach. He said he signed a Miranda waiver without reading it and that the officers did not explain his rights to him. He said the interrogation involved other officers and went on for hours. He said he was taken into a room with Omarr Hurd. He said Hurd was crying and told him to tell what he knew. He said he was then taken into another room where he could hear his mother and his sister in the next room. He said he asked to see his family and was told that if he confessed that he shot the victims, he would be allowed to see his family and go home. He said he was told

that if he did not confess, his sister, her boyfriend, and Hurd would be arrested, charged, and given life sentences. He said some officers also told him they would kill his sister.

The petitioner said that he signed a second Miranda waiver but that his rights were not explained to him. He said the officers presented him with a self-defense theory and represented that if he adopted this story in a statement, he would serve no more than "just a little bit of time" and would be allowed to go home with his family. He said his statement was completed around 9:00 p.m. He said he signed a written copy of his statement and was booked into the jail.

The petitioner testified that trial counsel said he could not present a defense based upon a theory of innocence but that he could guarantee him a sentence of three to six years under a self-defense theory. The petitioner also said trial counsel did not advise him that he could testify at the suppression hearing. He said trial counsel told him not to say anything about the beatings he claimed he suffered at the hands of the police.

The petitioner admitted that trial counsel was his second attorney, having been appointed after the petitioner complained to the trial court about the first attorney. He said he complained "to a degree" to the trial court about trial counsel about six months before the trial.

The petitioner testified that what actually happened with respect to the crimes was that one of the victims had asked Hurd for a gun. The petitioner said he rode with Hurd, the petitioner's sister, and her boyfriend to the victims' apartment. The petitioner said he went to the apartment, knocked on the door, gave the gun to one of the victims, and left. The petitioner said he had a broken-down car parked at the apartment, from which he took some CDs and tapes before leaving. The petitioner claimed he had never seen a copy of his sister's statement that when he came back to the car, he said the victims would never see another sunrise.

The petitioner acknowledged that John McClee did not testify as a state's witness at trial. He said his attorney did not call McClee. He said he wanted his attorney to present McClee's testimony because McClee said in one of his statements that he saw Hurd shoot the victims.

Appellate counsel testified that he represented the petitioner at the motion for new trial and on appeal. He said that when he was appointed to represent the petitioner, it "may have been in my first year" of law practice. He said he had not previously handled an appeal or a first degree murder case. Appellate counsel testified that he could not specifically recall why he did not raise an appellate issue regarding probable cause for arrest. He said he thought "it just didn't appear to be [an issue] that would fly" based upon the statements placing the petitioner at the scene. He said that he was aware of Officer Ryall's testimony that the police relied on McClee's statement to arrest the petitioner and that McClee had given inconsistent statements. He said it was "possible" that he did not review the transcripts of the suppression hearing, although he believed that he had done so.

Police Officer William Goetsch testified that he was involved in the investigation of the victims' homicides. He said that on January 9, 2000, he spoke with John McClee, who reported that

-4-

his friends would not answer their telephone or door. He said he looked into a window of the victims' apartment and saw the victims' bodies inside. He said McClee did not say that he had been inside the apartment on the previous Saturday night or that he had witnessed the shooting.

Lieutenant Joseph Scott of the Memphis Police Department testified that he responded to the scene where the bodies were found. He spoke with McClee, who said he had come to the apartment and found the bodies. He said that McClee did not tell him that he had been inside the victims' apartment on the previous Saturday night or that he had witnessed the shooting. He said he also interviewed McClee's girlfriend, who said she and McClee had been inside the apartment the previous night and discovered the bodies at that time.

Officer James Fitzpatrick of the Memphis Police Department testified that he spoke with John McClee at 11:00 a.m. on January 10. He detailed the conflicting statements given by McClee. He said that McClee stated he had last seen the victims at their apartment on Thursday, January 6. He said McClee then said he last saw the victims on Friday, January 7, at a car dealership. He said McClee also stated that he had been at the victims' apartment with the petitioner and Omarr Hurd on Friday, January 7. He said McClee reported that a verbal altercation occurred between Hurd and one of the victims over "one of their mutual female acquaintances." He said McClee stated that Hurd produced a pistol and shot victim Moerings. He said McClee said he fled the scene and heard a second shot as he was doing so. Officer Fitzpatrick said McClee stated that he left and came back later with his girlfriend and "discovered" the victims and that he returned a second time with another friend and they called the police. Officer Fitzpatrick said McClee did not initially admit to having been inside the victims' apartment after the murders.

Officer Fitzgerald testified that the petitioner was arrested without a warrant at 10:25 a.m. on January 11 "as a direct result of information we received from Mr. McClee." He said four or five officers went to an apartment where the petitioner and Hurd were located and took them into custody. He said the petitioner would have arrived at the police station sometime between 12:00 and 12:30 p.m. He said that he advised the petitioner of his Miranda rights at 12:55 p.m. and that the petitioner was interviewed "[o]ff and on" for six or seven hours. He said the petitioner was confronted with inconsistencies in his statement and those of other witnesses during the process. He said that other information which was gathered during this time included statements from the petitioner's sister, the sister's boyfriend, and Omarr Hurd, and the presence of the petitioner's car at the apartment. He said the petitioner was advised of his Miranda rights a second time during the process. He said the petitioner signed his final statement at 9:15 p.m. He said that during the approximately eleven and one-half hours that the petitioner was in custody before signing his final statement, the petitioner did not have contact with his family or anyone other than the police.

Officer Fitzgerald testified that at the time the petitioner was arrested, he believed there was probable cause for the arrest based upon McClee's statement. He said the petitioner was not charged with murder until after giving his statement admitting that he shot the victims.

-5-

Officer James Ryall of the Memphis Police Department testified that he was the case coordinator for the victims' murders. He said he went to the scene on January 9, where he spoke with John McClee. He said McClee reported that he had come to check on his friends and found them both dead. He said Detective Scott received conflicting information from McClee that McClee had actually discovered the bodies on the night of January 8 when he had come to the apartment with a girl. Officer Ryall said McClee stated he had last seen the victims at their apartment on the evening of Thursday, January 6. Officer Ryall said that McClee then said he last saw the victims on Friday at a car dealership and that he later stated he found their bodies on Sunday, January 10[1] after not hearing from them for a couple of days. Officer Ryall recounted that McClee later admitted that he and a girl had been to the apartment and found the bodies the previous night.

Officer Ryall testified that the petitioner and Omarr Hurd were arrested at 10:15 a.m. on Tuesday, January 11. He said a warrant for the petitioner's arrest was not sought because there was an ongoing investigation. He said that McClee's information was inconsistent but that they were able to corroborate his story, which led them to Hurd and the petitioner. He acknowledged that at the time of the petitioner's arrest, the evidence the police had consisted of McClee's statements and the presence of the petitioner's car at the scene.

Officer Ryall testified that the process of developing the information on January 11 extended past the close of business and that the police reviewed the information with the prosecutor the next day. He said he filed an affidavit of complaint with the clerk on January 12 at 2:01 p.m. seeking charges against the defendant. He said the petitioner was not taken before a magistrate on January 11 because it was late in the evening when the petitioner confessed and the courts were closed.

Officer Ryall said that the petitioner's sister gave a statement in which she said the petitioner left the car with a gun, was gone a few minutes, and returned. He said the sister's boyfriend stated that the petitioner said he would kill them if they said anything. He said both of these statements were taken after the petitioner was in custody.

The petitioner was recalled and testified that he met with appellate counsel several times about the perjury charge on which appellate counsel represented him. He said that when he inquired about the appeal in the murder case, counsel said he had taken care of it and the petitioner need not worry. He said counsel did not advise him of the issues that would be raised on appeal. He said that he attempted to communicate with counsel by sending him numerous letters and that he also corresponded with the Board of Professional Responsibility and the appellate court.

After receiving the evidence, the trial court entered a written order detailing its findings of fact and conclusions of law. With respect to the claim that trial counsel was ineffective for failing to raise an unreasonable delay claim at the suppression hearing, the court found that there was sufficient proof at the suppression hearing and the post-conviction hearing to establish probable

---

[1] The witness testified that he went to the scene on January 9. He then said McClee stated he found the bodies on Sunday, January 10. This court notes that January 10, 2000, was a Monday. See Tenn. R. Evid. 201 (judicial notice).

cause for the petitioner's arrest, that he was advised of his Miranda rights, and that there was no undue delay in charging the petitioner. The court concluded that the petitioner had failed to establish his claim of ineffective assistance of counsel on this basis. On the ineffectiveness claim based upon failure to exploit John McClee's inconsistent statements at the suppression hearing, the court found that trial counsel adequately raised the inconsistencies. On the claim that appellate counsel was ineffective for failing to raise the probable cause claim, the court found that the petitioner failed to establish this claim because the evidence demonstrated that there was probable cause for his initial arrest and the issue would not have been successful on appeal.

The petitioner's appellate issues all relate to ineffective assistance of counsel claims. The burden was on the petitioner in the trial court to prove by clear and convincing evidence the factual allegations that would entitle him to relief. T.C.A. § 40-30-110(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. See Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). In this regard, the petitioner, as the appellant, has the burden of illustrating how the evidence preponderates against the judgment entered. Id. However, we review the trial court's conclusion regarding the effectiveness of counsel de novo because it involves mixed questions of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068. Failure to satisfy either prong results in the denial of relief. Id. at 697, 104 S. Ct. at 2069.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Thus, the fact that a

particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

## I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

### A. Failure to raise unreasonable delay issue in suppression motion

The petitioner claims that trial counsel failed to include in the motion to suppress a claim that the petitioner was subjected to an unreasonable delay in being brought before a magistrate after his warrantless arrest. He claims that the police did not have probable cause for the arrest and that they delayed bringing him before a magistrate in order to obtain more evidence to support a probable cause finding. He argues that it was this illegal detention that produced his inculpatory statement. Counsel testified that he was familiar with State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), and that he did not believe the petitioner had a viable claim of unreasonable delay.

First, we note that the issue of probable cause was determined adversely to the petitioner at the suppression hearing. The record reflects that the trial court found that the petitioner's warrantless arrest was based upon probable cause.

A person who has been arrested must be brought before a magistrate "without unnecessary delay." Tenn. R. Crim. P. 5(a). Our supreme court has recognized the perils of detention which extends into a period of unnecessary delay:

> Without question, incarceration for any period of time is inherently coercive. The custodial environment has been described as carrying a "badge of intimidation [though] not physical [which is] equally destructive of human dignity." Miranda v. Arizona, 384 U.S. at 457, 86 S. Ct. at 1619. Indeed, the techniques used in custodial interrogation are often geared to producing in the accused a compulsion to confess. See Id. 384 U.S. at 449-56, 86 S. Ct. at 1615-19. When a suspect is detained without being taken before a neutral person who explains the process, issues warnings, and assures that constitutional rights are honored, the intimidating environment is no doubt exacerbated. Nevertheless, most courts have not adopted a per se rule of exclusion, but instead require exclusion of a confession given during a period of unnecessary delay only if an examination of the totality of the circumstances reveals that the statement was not voluntarily given.

Huddleston, 924 S.W.2d at 670. Unnecessary delay is one of the factors to be taken into account in assessing the totality of the circumstances in determining whether a confession was given voluntarily. Id. at 671.

In denying post-conviction relief, the trial court found:

> It appears to the Court that Petitioner was arrested on January 11, 2000, approximately 10:30 a.m. He was transported to the Police Office arriving around noon. He was advised of his rights by means of an Advice of Rights Form signed at 12:55 p.m. on that date. A formal typewritten statement was given that evening, typed, reviewed and signed by Petitioner at 9:15 p.m.
> . . .
> During the course of the investigation while the defendant/Petitioner was in custody the officers testified that they continued to interview the Petitioner and other witnesses to check out their stories and confront them with the discrepancies. The petitioner was arrested around noon, he was advised and signed a waiver of rights form at 12:55 p.m. The investigation concluded and a written statement was taken beginning at 7:21 p.m. and concluding at 9:15 p.m. all on the same date. The next day the affidavit of complaint was filed and the petitioner was taken before a Magistrate and arraigned.

The court found, based upon the facts, that there had been no unreasonable delay in charging the petitioner. The petitioner has not demonstrated that the evidence preponderates against the trial court's factual determinations, which support its legal conclusion. He is not entitled to relief on this issue.

### B. Failure to exploit John McClee's inconsistent statements at suppression hearing

The trial court found that "the inconsistencies [in John McClee's testimony] were adequately raised" at the suppression hearing. We have reviewed the transcript of the suppression hearing and conclude that the evidence does not preponderate against that finding. The record reflects that trial counsel established at the suppression hearing that McClee's testimony and the presence of the petitioner's car at the apartment complex where the victims were killed were the basis for the petitioner's arrest. Counsel thoroughly cross-examined Officer Ryall on the fact that McClee gave inconsistent statements. Although counsel did not cross-examine Officer Ryall in detail about each inconsistency, counsel clearly established that McClee's statements were inconsistent. Counsel also emphasized through cross-examination of Officer Ryall that in neither of McClee's statements which preceded the petitioner's arrest did McClee implicate the petitioner as the shooter. The record reflects trial counsel's cross-examination of Officer Ryall placed before the trial court the question of whether McClee was a reliable source of information for establishing, in part, probable cause for

the petitioner's arrest. We hold that the petitioner has not demonstrated that the trial court erred in denying post-conviction relief on this basis.

## II. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Finally, we consider the petitioner's argument that he was deprived of the effective assistance of appellate counsel because no issue was raised regarding the existence of probable cause for his arrest. As noted in section A. above, the trial court found at the suppression hearing that the petitioner's arrest was based upon probable cause.

A defendant may be arrested without a warrant if a felony has been committed and the arresting officer has "reasonable cause" to believe the defendant committed the crime. T.C.A. § 40-7-103(a)(3). "Whether probable cause is present depends upon whether the facts and circumstances and reliable information known to the police officer at the time of the arrest 'were sufficient to warrant a prudent man in believing that the [individual] had committed an offense.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Officer Ryall's testimony at the suppression hearing was that John McClee gave two statements prior to the petitioner's arrest. Because of inconsistencies in the first statement, which was given on January 9, the police interviewed McClee a second time on January 10. Officer Ryall testified at the suppression hearing that in the second interview, McClee was more forthcoming. Officer Ryall said that in this second statement, McClee said that he had witnessed Omarr Hurd have a verbal altercation with one of the victims and shoot him. He said that McClee also stated that he saw the petitioner and Hurd "leaving at a high rate of speed in Omar[r Hurd]'s car." Officer Ryall said that prior to the petitioner's arrest, the police were able to corroborate anonymous information that the petitioner's car was still at the scene.

Upon review, we hold that the evidence supports the trial court's determination at the suppression hearing, and later at the post-conviction hearing, that the police had probable cause to believe the petitioner was culpable in the murders of the victims and therefore his warrantless arrest was not unreasonable. It follows that the petitioner would not have prevailed on direct appeal of this issue and that counsel was not deficient in not raising this issue.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-10-